# SUPREME COURT,
## STATE OF KANSAS.

## JULY TERM, 1904.

### PRESENT:

HON. WILLIAM A. JOHNSTON, CHIEF JUSTICE.
HON. WILLIAM R. SMITH,
HON. EDWIN W. CUNNINGHAM,
HON. ADRIAN L. GREENE,
HON. ROUSSEAU A. BURCH,  } JUSTICES.
HON. HENRY F. MASON,
HON. WILLIAM D. ATKINSON,*

---

THE STATE OF KANSAS v. FRITZ DUREIN.

No. 13,898. ( 78 Pac. 152.) †

SYLLABUS BY THE COURT.

1. INTOXICATING LIQUORS — *Information — Unnecessary · Allegations.* An information charging a defendant with selling intoxicating liquors without first obtaining from the probate judge of the proper county a permit for that purpose need not allege that he was not a registered pharmacist or assistant pharmacist in the employ of a druggist having a permit, in order to state a public offense.

2. ———— *Election— When Not Defective.* In a prosecution for selling intoxicating liquors contrary to law an election to rely on a transaction occurring on a stated day is not defective because the witnesses who testified to such transaction are not named, when there is no evidence of any other transaction on the same day; nor is it defective because it does not designate a sale to a particular individual, or group of individuals, out of a dozen men

---

*Succeeded by the Honorable CLARK A. SMITH, of Cawker City, December 1, 1904, who had been elected November 8, 1904, to fill the vacancy caused by the resignation of Mr. Justice POLLOCK.

†Pending in the supreme court of the United States on a writ of error allowed June 19, 1905.

1—70 KAN.

who were drinking, the witnesses to the transaction being unable to identify the precise person or persons who furnished the money observed to pass.

3. ———— *Sufficiency of Evidence.* In a prosecution of the character noted the evidence of a sale is not insufficient merely because the witnesses to the transaction were unable to identify, out of a dozen men who were drinking, the particular individual or individuals who furnished the money observed to pass.

4. PRACTICE, SUPREME COURT—*Interpretation of Record.* In a criminal appeal the record of the proceedings in the trial court will not be interpreted to show error, if it be susceptible of a reasonable interpretation to the contrary.

5. ———— *Retrospective Inferences.* The law relating to retrospective inferences discussed, and applied to the evidence and instructions to the jury in this case.

6. STATUTORY CONSTRUCTION—*Not Invalid Because of Discretion over Permits Vested in Probate Judge.* The statutes of this state regulating the sale of intoxicating liquors are not violative of the fourteenth amendment to the constitution of the United States because of the discretion vested in the probate judges of the respective counties over the subject of granting permits to sell such liquors for medical, mechanical and scientific purposes.

7. PRACTICE, DISTRICT COURT—*New Trial.* It is not an abuse of discretion for the district court to refuse a new trial, in a misdemeanor case, on account of the defendant's former conviction of the same offense, when such conviction was first brought to its attention by the motion for a new trial.

Appeal from Shawnee district court; Z. T. HAZEN, judge. First opinion filed October 8, 1904. Affirmed. Rehearing granted November 5, 1904. Second opinion filed May 6, 1905. Reaffirmed.

*C. C. Coleman*, attorney-general, and *A. L. Redden*, for The State.

*G. C. Clemens*, and *C. A. Magaw*, for appellant.

The opinion of the court was delivered by

BURCH, J.: On June 28, 1902, Miss Blanche Boies, Mrs. Henry Howard and others of a praying-band, five in number, went to certain rooms in a brick building at No. 402 Quincy street, in the city of Topeka,

and found there a flourishing beer-saloon. In the place were a bar and shelves and bottles and glasses and tables. Men were sitting at the tables playing cards, and a dozen others were at the bar drinking. A man behind the bar was handing out beer to them, which they drank and paid for, one of the women seeing the money pass. One of the women asked the bartender if that was Mr. Fritz Durein's saloon, and he said it was. She asked for the proprietor, and he said he was Fritz Durein. In the course of a conversation with him he told the women he did not think it wrong to keep a saloon ; that it was not against his religion, and that he intended to keep right on running a saloon and selling beer. He drank a glass of it himself and asked the women to have some.

On January 10, 1903, an assistant attorney-general of the state of Kansas for Shawnee county filed an information against this Fritz Durein, charging him with selling liquor without a permit and with maintaining a nuisance at the place described. A warrant was issued at once. Within twenty minutes after receiving the writ the sheriff of Shawnee county and two of his deputies were at the place, and found it to contain a bar and shelves and glasses and tables.and an ice-box, bottles and kegs of beer, bottles of whisky, and a miscellaneous lot of bottles and various kinds of liquor, some labeled beer, and some hop-tea, and some wine. Ten or twelve persons were in the room, some sitting at tables and some standing at the bar drinking. Durein was behind the bar setting out beer. Upon a trial the officers and the members of the praying-band already named related the foregoing facts, and a verdict was returned against Durein, finding him guilty of the offenses charged. Judgment upon the verdict was duly rendered, and in an appeal to this court numerous errors are assigned.

The count of the information under which the appellant was convicted of an unlawful sale of intoxicating liquor charged that he made such sale without first taking out and having from the probate judge of Shawnee county a permit for that purpose. It is insisted that every word of that count of the information might be true and the appellant be innocent of any offense, for, it is said, although he had no permit he had a lawful right to sell if he was a registered pharmacist or assistant pharmacist in the employ of one having a permit. Hence it is claimed the count should have been quashed for want of an allegation negativing the bearing of any character by the appellant which might afford him immunity from prosecution. No such allegation was necessary. The statute recognizes no independent right in a druggist's clerk who is a registered pharmacist or assistant pharmacist to make sales of intoxicating liquors. Sales made by such a clerk are regarded as made by the druggist himself. The clerk's identity is merged in that of his employer; and since he has no distinct character of his own, as a dispenser of liquor, a complaint for selling without a permit need not negative such character in order to charge a public offense.

In response to a motion requiring the state to elect upon what transaction it would rely to convict the appellant of an unlawful sale of intoxicating liquors it elected to rely upon an alleged sale to parties whose names were unknown, made on the 28th day of June, 1902. The names of the witnesses to such sale were not stated in making the election, and no further attempt was made to individualize any particular sale. The court instructed the jury that the state relied upon a sale of intoxicating liquor by the appellant to parties whose names were unknown, as testified to by the witnesses, Mrs. Howard and Miss Boies, such sale

having been made on June 28, 1902. It is claimed the election was insufficient, and that a conviction was impossible under the evidence of the witnesses named.

No witnesses gave evidence of a sale on June 28, 1902, except those named in the instruction, and their testimony related to the same transaction. The mere fact that a dozen men were drinking at once, or during a given period of observation, and that the witnesses were unable to identify the particular individual or individuals who furnished the money observed to pass, did not militate against the fact that a sale was made. A liquor-seller cannot escape punishment because sales are made to men in such groups, or in such a manner, that witnesses cannot separately discriminate them. If all the elements of a sale appear in evidence, it is sufficient to support a verdict of guilty, even though a keener scrutiny might have detected that several sales were in fact made. The inability of witnesses fully to describe the transaction ultimately advantages the accused, because he is protected against any further prosecution on account of anything which the transaction in fact included. The nuisance sections of the statute do not cover such cases, for sales of the character described may be made by one not the keeper of the place, and if a keeper should also sell he is subject to the penalties prescribed for both offenses. Therefore the election was sufficient, and the verdict was sufficiently supported by the evidence.

A witness testified to sales of intoxicating liquor by the appellant, but before his examination was concluded it was discovered that such sales were made long after the information had been filed. The record then discloses the following :

"The Court: Any testimony concerning anything

that may have occurred since this information was filed would not be competent.

"Mr. Redden : The information was filed January 10, 1903.

"The Court : Then the testimony of this witness as to last spring is withdrawn.

"Q. Were you not in there during the spring or summer of 1902?   A.  I don't think I was.

"Q.  Were you not in there about June, 1902 ?   A. I don't remember that.

"Q.  And thereafter ?   A.  I don't remember being in there, as I said.

"Q.  That is, until in the spring of 1903 ?   A.  Yes, sir.

"The Court : This evidence is not competent in this case.   Anything that occurred since the information was filed cannot be considered against the defendant."

Appellant insists that the remarks of the court were addressed to counsel only, and not to the jury.  The record cannot be interpreted to show error, if it be susceptible of a reasonable interpretation to the contrary.   Plainly the statements that the testimony of the witness was withdrawn and that anything occurring since the information was filed could not be considered might have been directed to the jury, and, if so, they were sufficient to take the objectionable evidence out of the case.   That the court so intended is apparent from its conduct in overruling the motion for a new trial, and the appellant does not show the contrary to be true.

The nuisance count of the information under which appellant was convicted charged that he maintained a place where intoxicating liquors were sold, and were kept for sale, and where persons resorted to drink intoxicating liquors, contrary to law, on March 2, 1901, and divers other days and times between that day and

the filing of the information.   The court instructed the jury as follows :

"The court has permitted the officers who served the warrant in this case to testify as to what they saw and found at the place described in the information at the time they went to the place for the purpose of serving the warrant.   This testimony is competent to be considered by the jury in passing upon the question as to whether the place described in the information was a common nuisance at the time charged.   But this testimony is not competent, and cannot be considered by you in your deliberations in the jury-room, for the purpose of determining whether the defendant was the keeper of this place at the time charged.   On the question of whether the place described in the complaint was a common nuisance at the time therein charged, this testimony is competent to be considered, together with all the other facts and circumstances proven, for the purpose of determining whether the place described in the complaint at the time charged was a common nuisance by reason of being a place where intoxicating liquors were kept for sale and sold in violation of law."

Appellant argues that a retrospective inference from the condition of the place on January 10, 1903, to the effect that a nuisance existed prior to that time, would be illegitimate, and that after the court had instructed the jury there was left neither evidence nor presumption that he was a keeper at any other time than on June 28, 1902.

In the case of *Topeka v. Chesney*, 66 Kan. 480, 71 Pac. 843, the sole question for consideration was the relation of a man, charged as keeper, to a liquor nuisance at a particular place—a relation which in and of itself is not necessarily or essentially a continuing or enduring one.   The question was sharply

raised by an instruction, and its decision was accurately expressed in the syllabus, which reads:

"In a prosecution for keeping a place where intoxicating liquors were sold in violation of a city ordinance, evidence relating to the condition of the place five days after the date of the offense, and three days after the filing of the complaint, was inadmissible to prove that the defendant was the keeper of the place."

The opinion related solely to the point under consideration, and was based upon two grounds—one of simple logic, forbidding that mere proof of facts showing a place to be a nuisance will also identify its keeper; and another of law, founded upon sound reason, forbidding the indulgence of retrospective inferences. That retrospective inferences may be indulged in some cases was expressly recognized, but some confusion may have resulted from the citation of the peremptory rule given in volume 22 of the second edition of the American and English Encyclopedia of Law, at page 1239. The paragraph from the encyclopedia is in effect an elaboration of rule 37 in Lawson on Presumptive Evidence, which states that "a presumption is not retrospective." Professor Lawson's statement, like that of the encyclopedia, is based upon the decisions of reputable courts, and has been expressly approved in *Jarvis v. Vanderford*, 116 N. C. 147, 21 S. E. 302, and in *Martyn v. Curtis*, 67 Vt. 263, 31 Atl. 296. In the first case it was decided that because certain persons held official positions at a given date it could not be inferred they were such officers some years before, and in the second it was held that the use of land as a pasture at a particular time did not warrant an inference that it had previously been so used. The same

rule is given in section 110 of volume 1, Elliott on
Evidence (Sept. 1, 1904), and supported by abundant
authority.   Likewise, in the case of *Barnes v. The Com-
monwealth*, 2 Dana (Ky.) 388, it was held that, upon
the trial of an indictment for keeping a tippling-house
in March, proof of keeping such house in the follow-
ing August was inadmissible, which could not have
been true if a revertive inference of continuity had
been allowable.

These authorities are all sound in principle, but
some discrimination must be used in the application
of general rules to particular states of fact.   The na-
ture of the subject is of importance.   From their
present condition and appearance it might be reason-
ably inferred that the pyramids of Egypt have endured
without essential modification for a long period of
time.   No such inference is possible concerning frost
films on the window-pane.   The quality of substan-
tially changeless continuity inheres in the one, and
not in the other.   Between such classes of objects,
and separated from one another by infinitesimally
slight signs of difference, lies an infinity of states,
conditions, and relations, complicated by the interposi-
tion of human activities.   Of some of these persistence
may not be predicable at all, and of some of them
such an affirmation may be made with reasonable
certainty, within wider or narrower time limits.
When one of these matters is offered in court as an
evidentiary fact it may be that its admissibility can-
not be determined by any fixed standard of law.
Thus, in negligence cases, the condition of a place,
or of an appliance, shortly before and shortly after an
accident, when there is nothing to indicate a change,
may be relevant, when the lapse of a slightly greater
interval, or a very little modification of circumstance,

would destroy its value altogether. Therefore very frequently something must be left to the cautious exercise of the court's best judgment upon the peculiar facts of the particular case. Sometimes, in criminal cases, the presumption of continuity will run counter to the presumption of innocence, in which event it must yield as the weaker of the two. (22 A. & E. Encycl. of L., 2d ed., 1237 ; Laws. Presump. Ev., rule 38.)

In order to be such a nuisance must exist for some length of time. The coordination of its elements must have an appreciable duration, and, in ordinary cases, continuity for a period considerably beyond the limits of the *de minibus* rule may be safely asserted.

"If attention is directed to any point of time during the keeping, there is a probability, from the very fact of keeping then, that the same condition has existed from some previous time, and will continue for some time into the future. And so, as to offenses which are in their nature continuing, evidence has often been received of a condition a little before or a little after the time within which the offense must be proved. And this rule has been repeatedly applied to prosecutions for unlawfully keeping intoxicating liquor with intent to sell it. . . . The introduction of this kind of evidence should be carefully guarded, and the testimony should be confined to a time very near the time in question, or should be connected with it by evidence showing a continuance of the same condition through the entire intervening period." (*Commonwealth v. Finnerty*, 148 Mass. 162, 166, 19 N. E. 215.)

In the case just cited the evidence showed practically a continuing state of affairs for some three weeks following the date to which the principal evidence related.

In the case of *Commonwealth v. Powers*, 123 Mass. 244, the rule was extended to include the condition of

a room where liquors, it was alleged, had been kept, as to appointments and fixtures, at eight o'clock of the morning following the day of the offense. In some cases more radical decisions have been made, but without discussion of the principle involved.

In the case now under consideration appellant might have been convicted of maintaining a nuisance on the day the information was filed. Within a few minutes after the action was commenced he was found apparently in charge of a well-appointed saloon, personally dispensing beer. The evidence disclosing this fact should have gone to the jury without limitation. However, the fact that the court attempted to impose restrictions upon its probatory force was to the advantage of the appellant and he cannot complain.

The simple fact of the existence of a nuisance at the place in question on January 10, 1903, after the information had been filed, or that fact combined with the fact that appellant was its keeper at that time, could not be related to the existence or keeping of a nuisance at the same place in June of the preceding year by mere force of a retrospective inference. However, on June 28, 1902, appellant told his visitors that he was the proprietor of the saloon then running at the place in controversy, and assured them that he intended to keep right on running a saloon and selling beer. In the light of this declaration, the fact that in January following the same saloon was running in apparently the same way, and that appellant was still there setting out beer, took on an aspect which the jury might consider without violating any of the rules of law or of logic. Therefore, under the evidence, the instruction as a whole was not prejudicial to the appellant.

The constitutionality of the law regulating the sale

of intoxicating liquor in this state is assailed, and the argument is made that the sale of liquors for medical, mechanical and scientific purposes is a lawful and virtuous business, necessary for the welfare of the community ; that permits to carry on such business must, therefore, be obtainable as a matter of right ; that the statute gives to probate judges an arbitrary and unrestrained authority to refuse permits for such purposes ; that the vesting of such power in probate judges renders the statute void, and hence that no one can be punished for selling liquors without a permit. The opinion of the supreme court of the United States in the case of *Mugler v. Kansas*, 123 U. S. 623, 8 Sup. Ct. 273, 31 L. Ed. 205, effectually disposes of this argument.    Mr. Justice Harlan there shows, both by reason and upon authority, that the right to manufacture, sell and use articles of trade is conditioned upon the fact that such conduct does not deleteriously affect the rights of the public ; that if any business becomes prejudicial to the welfare of the community, society has the right to protect itself against such injurious consequences ; that the legislature of the state has the right to determine what measures are appropriate or needful for the protection of the public morals, health, and safety, and unless a statute has no real or substantial relation to those objects the courts cannot interfere.    It is then shown that if, in the judgment of the legislature, the manufacture of intoxicating liquors for the maker's own use as a beverage would tend to cripple or defeat the effort to guard the community against the evils attending the excessive use of such liquors, prohibition may follow.    So, if the manufacture and sale of liquors for medical, mechanical and scientific purposes merely opens the door to the train of evils following upon the general use of

The State v. Durein.

intoxicants, they may be prohibited; and since they may be prohibited, they may be regulated in the manner prescribed by the statutes of this state.

At the hearing of the motion for a new trial appellant made a showing to the effect that he had once suffered a conviction of the offenses charged in the information. His attorneys were ignorant of the fact until after the verdict had been returned, and appellant claimed he did not know of the importance of the former conviction until the trial had been concluded. It is conceded that the former conviction was not presented at the proper time, or in the proper manner, to obtain, as a matter of right, the protection it might have afforded, and such is the law; but it is argued that the district court might have used it as a basis of an exercise of its discretionary power to grant a new trial. Conceding this to be true, it was not an abuse of discretion to refuse a new trial.

The judgment of the district court is affirmed.

All the Justices concurring.

---

OPINION ON REHEARING.
( 80 Pac. 987.)

SYLLABUS BY THE COURT.

1. INTOXICATING LIQUORS — *Legislature May Absolutely Prohibit Manufacture or Sale.* Whenever, in its judgment, it is necessary for the protection of the health, morals, peace and safety of the people the legislature may prohibit the manufacture and sale of intoxicating liquors in this state for medical, scientific and mechanical purposes; and in the interest of the public welfare it may impose any conditions upon the conduct of those industries short of prohibition which it may deem proper.

2. ———— *Right to Sell Not a Privilege or Immunity of Citizenship.* The right to sell intoxicating liquors is not one of the privileges or immunities attaching to citizenship in the United States.

3. ———— *State Constitution Affects Power of Legislature to Tol-*

*erate, Not to Restrain, Liquor Traffic.* The amendment to the state constitution prohibiting the manufacture and sale of intoxicating liquors except for medical, scientific and mechanical purposes affected the power of the legislature to tolerate only, and did not abridge its power further to restrain or prohibit, the liquor traffic.

4. PROBATE JUDGE — *Discretion over Permits to Sell Liquors is Judicial.* The discretion vested by the statutes of this state in the probate judge over the subject of granting and refusing permits to sell intoxicating liquors is not an option to act according to prejudice or caprice, but it is a judicial discretion, to be exercised only with reference to the facts and circumstances of each case, after a full hearing.

5. ———— *Statute Authorizing Appeal and a Proceeding in Error, if Permit be Refused, is Valid.* The provisions of the statute of this state authorizing an appeal and a proceeding in error from the action of the probate judge in refusing to grant permits to sell intoxicating liquors are valid, and afford ample remedies to those who wrongfully may be denied such permits.

The opinion of the court was delivered by

BURCH, J. : Fritz Durein was convicted of selling intoxicating liquors without a permit, and appeals to this court. At a former hearing the conclusion of the court upon one of the questions involved was expressed in the following syllabus :

"The statutes of this state regulating the sale of intoxicating liquors are not violative of the fourteenth amendment to the constitution of the United States because of the discretion vested in the probate judges of the respective counties over the subject of granting permits to sell such liquors for medical, mechanical and scientific purposes." (*Ante*, p. 1.)

On account of the importance of this subject appellant's petition for a rehearing was granted, and he has again been heard, both by brief and oral argument.

The precise character of the statutes in question cannot be understood from an abridgment, and they are, therefore, reproduced here :

"Any person or persons who shall manufacture,

sell or barter any spirituous, malt, vinous, fermented or other intoxicating liquors, shall be guilty of a misdemeanor, and punished as hereinafter provided; provided, however, that such liquors may be sold for medical, scientific and mechanical purposes, as provided in this act." (Laws 1881, ch. 128, § 1; Gen. Stat. 1901, § 2451.)

"It shall be unlawful for any person or persons to sell or barter for medical, scientific or mechanical purposes, any malt, vinous, spirituous, fermented or other intoxicating liquors, without first having procured a druggist's permit therefor from the probate judge of the county wherein such druggist may be doing business at the time; and such probate judge is hereby authorized, in his discretion, to grant a druggist permit for the period of one year to any person of good moral character who is a registered pharmacist under the law of this state, and lawfully and in good faith engaged in the business of a druggist in his county, and who in his judgment can be entrusted with the responsibility of selling said liquors for the purposes aforesaid, in the manner hereinafter provided; and said judge may at any time in his discretion revoke such permit. In order to obtain a druggist permit under this act, the applicant shall file in the office of the probate judge of the county wherein he is doing business, not less than thirty days prior to the hearing thereof, a petition signed by the applicant and twenty-five reputable freeholders having the qualifications of electors, and twenty-five reputable women over twenty-one years of age, of the township, city of third class, or ward of any other city wherein such business is located, setting forth : *First*, the city or township and particular place therein where such business is located, and that the applicant is a person of good moral character, and does not use intoxicating liquors as a beverage, and can be entrusted with the responsibility of selling the same ; *second*, that said applicant is a pharmacist aforesaid, and is lawfully and in good faith engaged personally in the business of a druggist as the proprietor thereof at the place

designated in the petition, and is well versed in his profession; *third*, that said applicant has, in his said business, exclusive of intoxicating liquors and fixtures, a stock of drugs, if in any city, of the value of at least one thousand dollars, and if elsewhere, of the value of at least five hundred dollars. Before any such petition shall be heard, or any permit issued to such applicant, he shall publish for at least thirty days next prior thereto a notice published in some newspaper in the township or city where such business is located, or if none be published therein, then in some paper of general circulation therein, stating the time and place set by such judge for the hearing of such petition. The applicant shall be required to prove the truthfulness of each and every statement contained in such petition, and the county attorney of such county shall, and any other citizen of the county may, appear and cross-examine the witnesses of the applicant, and may introduce evidence in rebuttal of the evidence offered by the applicant. If satisfied that the signatures to such petition were signed by such persons, and that such petitioners are citizens of such township, city, or ward, and that the statements in said petition are all true, the probate judge may in his discretion grant a permit to the applicant to sell intoxicating liquors for medical, mechanical and scientific purposes only; and such permit shall be recorded upon the journal of the probate court, and a certified copy thereof shall be posted in a conspicuous place in the store wherein said business is carried on before it shall be of any validity. Before such permit shall be of any validity such druggist shall file with the probate judge, to be approved by him, a good and sufficient bond to the state of Kansas in the sum of one thousand dollars, conditioned that such applicant and any one in his employ will neither use, sell, barter, nor give away any intoxicating liquors in violation of law; and on violation of the provisions of said bond the same shall thereby become forfeited, and the conviction of such pharmacist or any one in his employ shall be deemed *prima facie* evidence of such violation. Any appli-

The State v. Durein.

cant or any citizen feeling himself aggrieved by the decision of the probate judge may within ten days thereafter, upon filing a bond made payable to the state of Kansas in the sum of fifty dollars, to be approved by the probate judge, conditioned that he will prosecute the cause to its speedy determination and pay the costs occasioned by such appeal if the order of the probate judge shall be sustained, prosecute the cause upon appeal or error to the district court.  The procedure in any case taken on error to the district court from the order of the probate judge, shall be as prescribed by article twenty-two of the code of civil procedure so far as applicable, and a case or bill of exceptions may be made, signed and certified by the probate judge as in said article provided.  If the district court shall find that the probate judge has abused his discretion it shall have power to cause the probate judge to comply with its judgment, otherwise the order of the probate judge shall be by the district court affirmed. . No appeal shall be allowed from the order of the district court.  If the order of the probate judge shall be reversed, the costs shall be paid by the county."  (Laws 1881, ch. 128, § 2, as amended by Laws 1885, ch. 149, § 1, as amended by Laws 1887, ch. 165, § 1; Gen. Stat. 1901, § 2452.)

These acts were passed subsequently to an amendment to the constitution, which reads as follows :

"The manufacture and sale of intoxicating liquors shall be forever prohibited in this state, except for medical, scientific and mechanical purposes."  (Art. 15, § 10.)

The bill of rights contains the following provision :

"All political power is inherent in the people, and all free governments are founded on their authority, and are instituted for their equal protection and benefit.  No special privileges or immunities shall ever be granted by the legislature, which may not be altered, revoked or repealed by the same body ; and this power shall be exercised by no other tribunal or agency."  (§ 2; Gen. Stat. 1901, § 84.)

The fourteenth amendment to the constitution of the United States, so far as applicable, is as follows:

"No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws."

The position of the appellant, in substance, is that the sale of liquors for the purposes excepted in the constitution cannot be prohibited by the legislature because of limitations expressed in, or implied from, that instrument; that such a prohibition would transcend even the power of the people themselves, acting through the agency of a constitutional convention; that intoxicating liquors, when used for medical, scientific and mechanical purposes, are essential to the welfare of the people, lawful and innocent commodities, and property which the law must protect; that permits to sell intoxicating liquor for such purposes must be obtainable as matters of absolute right; that the statute of this state governing the matter vests in the probate judge an arbitrary and unrestrained discretion to refuse, which renders it void; that the provision in the statute for an appeal is of no effect because no method for taking an appeal is prescribed; that the provision for a review on error is void because the question of an abuse of arbitrary discretion cannot be tried on error; and that the discretionary power of the probate judge violates section 2 of the bill of rights.

Counsel for the state made the point, at the rehearing, that appellant is in no position to question the validity of the statutes assailed because the record does not show that he has suffered anything on account of the claimed arbitrary character of the power

wielded by the probate judge. Properly speaking, this is true; but, because the matter was not pressed until the case had once been decided in favor of the state and had been assigned for reargument upon the constitutional question only, and because other cases are now awaiting determination which the decision in this one is intended to control, in which the objection now interposed could not be urged, the merits of the controversy will be investigated.

The claim of the defendant that the statute is void because it delegates a power which under the section of the bill of rights quoted can be exercised only by the legislature is untenable. That section relates to political powers and privileges, and not to property rights or interests, or to the conduct of any ordinary business or calling. The reference to it, made in the case of *In re Lowe, Petitioner*, 54 Kan. 757, 763, cited by appellant, was inapt. The proposition advanced was examined with care and discussed at length in the case of *Atchison Street Rly. Co. v. Mo. Pac. Rly. Co.*, 31 Kan. 660, and the correct conclusion reached, as stated above.

The main question, therefore, of the extent of the power of the legislature over traffic in intoxicating liquors within the borders of the state, and of the rightfulness of the display of power embodied in the statutes quoted, immediately confronts the court.

The commodity in controversy is intoxicating liquor. It is not corn, or rye, or hops, or grapes, or any other product, the cultivation and use of which minister to the normal and necessary wants of mankind; nor is it any solvent, preservative, essence, tincture, chemical, drug or compound used in the arts or sciences which does not possess the character and quality of intoxicating liquor. But the article is one whose use, even

moderately, is taken into account by actuaries of in-
surance companies, and which bars employment in
classes of service involving prudent and careful con-
duct; an article conceded to be fraught with such con-
tagious peril to society that it occupies a different
status before the courts and the legislatures from
other kinds of property, and places traffic in it upon a
different plane from other kinds of business.    There
is, therefore, no question in this case of the power of
the legislature to say generally what beverages men
shall drink, or what they shall eat or wear, or when
they shall rise or retire.   The discussion must deal
solely with a distinct article of trade, which already
has earned a certain measure of reproach among civil-
ized peoples.

"It is urged that, as the liquors are used as a
beverage, and the injury following them, if taken in
excess, is voluntarily inflicted and is confined to the
party offending, their sale should be without restric-
tions, the contention being that what a man shall drink,
equally with what he shall eat, is not properly mat-
ter for legislation.   There is in this position an as-
sumption of a fact which does not exist, that when
the liquors are taken in excess the injuries are con-
fined to the party offending.   The injury, it is true,
first falls upon him in his health, which the habit
undermines; in his morals, which it weakens; and
in the self-abasement which it creates.   But, as it
leads to neglect of business and waste of property and
general demoralization, it affects those who are im-
mediately connected with and dependent upon him.
By the general concurrence of opinion of every civil-
ized and Christian community, there are few sources
of crime and misery to society equal to the dram-
shop, where intoxicating liquors, in small quantities,
to be drunk at the time, are sold indiscriminately
to all parties applying.   The statistics of every state
show a greater amount of crime and misery attributa-
ble to the use of ardent spirits obtained at these retail

liquor saloons than to any other source.'' (*Crowley v. Christensen*, 137 U. S. 86, 90, 11 Sup. Ct. 13, 34 L. Ed. 620.)

It is true that intoxicating liquors may be devoted to sacramental, medical, scientific and mechanical uses, all conducive to the welfare of society; but this fact does not remove the stigma which has been fixed upon them.   Intoxicating liquor is intoxicating liquor still, whether it be employed before the altar, at the bedside, in the laboratory, in the manufactory, or in the saloon.   It is still the prolific source of disease, misery, pauperism, vice, and crime.   Its power to weaken, corrupt, debauch and slay human character and human life is not destroyed or impaired because it may be susceptible of some innocent uses, or may be used with propriety on some occasions.   The health, morals, peace and safety of the community at large are still threatened, and under the form of government established for this state, and for the union of states of which it is a member, those are special subjects of local legislative cognizance.

Both for his own good and for the good of the state the will of the individual should be allowed the widest possible latitude.   But he cannot be left to define his own sphere of liberty in all cases.   While he cannot be subjected to the arbitrary and despotic dominion of others, absolute autonomy is but a synonym for anarchy.   Therefore the state must of necessity at times interfere.   Such interference may extend to the taking of life itself.

''He may be compelled, by force if need be, against his will and without regard to his personal wishes or his pecuniary interests, or even his religious or political convictions, to take his place in the ranks of the army of his country, and risk the chance of being shot

down in its defense." (*Jacobson v. Massachusetts*, 197 U. S. 11, 25 Sup. Ct. 358, 362, 49 L. Ed. 643.)

Nothing is more sacred than the right of the individual to the care of his own body and the preservation of his own health. To many persons the injecting of vaccine virus into the flesh and blood is utterly loathsome, and should be repelled as an assault of the most abhorrent and abominated kind ; yet, in the interest of the public health, submission to it may be enforced by criminal penalties.

"But the liberty secured by the constitution of the United States to every person within its jurisdiction does not import an absolute right in each person to be, at all times and in all circumstances, wholly freed from restraint. There are manifold restraints to which every person is necessarily subject for the common good. On any other basis organized society could not exist with safety to its members. Society based on the rule that each one is a law unto himself would soon be confronted with disorder and anarchy. Real liberty for all could not exist under the operation of a principle which recognizes the right of each individual person to use his own, whether in respect of his person or his property, regardless of the injury that may be done to others. This court has more than once recognized it as a fundamental principle that 'persons and property are subjected to all kinds of restraints and burdens in order to secure the general comfort, health, and prosperity of the state ; of the perfect right of the legislature to do which no question ever was, or upon acknowledged general principles ever can be, made, so far as natural persons are concerned.' *Hannibal & St. J. R. Co. v. Husen*, 95 U. S. 465, 471, 24 L. Ed. 527, 530 ; *Missouri, K. & T. R. Co. v. Haber*, 169 id. 613, 628, 629, 42 L. Ed. 878–883, 18 Sup. Ct. 488 ; *Thorpe v. Rutland & B. R. Co.*, 27 Vt. 148, 62 Am. Dec. 625. In *Crowley v. Christensen*, 137 U. S. 86, 89, 34 L. Ed. 620, 621, 11 Sup. Ct. 13, we said : 'The possession and enjoyment of all

rights are subject to such reasonable conditions as may be deemed by the governing authority of the country essential to the safety, health, peace, good order, and morals of the community. Even liberty itself, the greatest of all rights, is not unrestricted license to act according to one's own will. It is only freedom from restraint under conditions essential to the equal enjoyment of the same right by others. It is, then, liberty regulated by law.'" (*Jacobson v. Massachusetts, supra*, 361.)

The manufacture and sale of property in itself wholesome and harmless may be entirely prohibited merely to prevent deception and fraud.

"Moreover, concede for the sake of argument only, that even although a particular exertion of power by congress was not restrained by any express limitation of the constitution, if by the perverted exercise of such power so great an abuse was manifested as to destroy fundamental rights which no free government could consistently violate, that it would be the duty of the judiciary to hold such acts to be void upon the assumption that the constitution by necessary implication forbade them.

"Such concession, however, is not controlling in this case. This follows when the nature of oleomargarine, artificially colored to look like butter, is recalled. As we have said, it has been conclusively settled by this court that the tendency of that article to deceive the public into buying it for butter is such that the states may, in the exertion of their police powers, without violating the due-process clause of the fourteenth amendment, absolutely prohibit the manufacture of the article." (*McCray v. United States*, 195 U. S. 27, 63, 24 Sup. Ct. 769, 49 L. Ed. 78.)

"It has therefore been adjudged that the states may legislate to prevent the spread of crime, and may exclude from their limits paupers, convicts, persons likely to become a public charge, and persons afflicted with contagious or infectious diseases. These and other like things having immediate connection with

The State v. Durein.

the health, morals, and safety of the people, may be done by the states in the exercise of the right of self-defense. . . . The deception against which the statute of Massachusetts is aimed is an offense against society; and the states are as competent to protect their people against such offenses or wrongs as they are to protect them against crimes or wrongs of more serious character. And this protection may be given without violating any right secured by the national constitution, and without infringing the authority of the general government. A state enactment forbidding the sale of deceitful imitations of articles of food in general use among the people does not abridge any privilege secured to citizenship of the United States, nor, in any just sense, interfere with the freedom of commerce among the several states. It is legislation which 'can be most advantageously exercised by the states themselves.' *Gibbons v. Ogden*, 9 Wheat. 1, 203, 6 L. Ed. 23." (*Plumley v. Massachusetts*, 155 U. S. 461, 478, 15 Sup. Ct. 154, 39 L. Ed. 223.)

"Whether the manufacture of oleomargarine, or imitation butter, of the kind described in the statute, is, or may be, conducted in such a way, or with such skill and secrecy, as to baffle ordinary inspection, or whether it involves such danger to the public health as to require, for the protection of the people, the entire suppression of the business, rather than its regulation in such manner as to permit the manufacture and sale of articles of that class that do not contain noxious ingredients, are questions of fact and of public policy which belong to the legislative department to determine. And as it does not appear upon the face of the statute, or from any facts of which the court must take judicial cognizance, that it infringes rights secured by the fundamental law, the legislative determination of those questions is conclusive upon the courts. It is not a part of their functions to conduct investigations of facts entering into questions of public policy merely, and to sustain or frustrate the legislative will, embodied in statutes, as they may happen to approve or disapprove its determination of

The State v. Durein.

such questions.   The power which the legislature has to promote the general welfare is very great, and the discretion which that department of the government has, in the employment of means to that end, is very large.  .  .  .   The legislature of Pennsylvania, upon the fullest investigation, as we must conclusively presume, and upon reasonable grounds, as must be assumed from the record, has determined that the prohibition of the sale, or offering for sale, or having in possession to sell, for purposes of food, of any article manufactured out of oleaginous substances or compounds other than those produced from unadulterated milk or cream from unadulterated milk, to take the place of butter produced from unadulterated milk or cream from unadulterated milk, will promote the public health, and prevent frauds in the sale of such articles.   If all that can be said of this legislation is that it is unwise, or unecessarily oppressive to those manufacturing or selling wholesome oleomargarine, as an article of food, their appeal must be to the legislature, or to the ballot-box, not to the judiciary. The latter cannot interfere without usurping powers committed to another department of government.'' (*Powell v. Pennsylvania*, 127 U. S. 678, 685, 8 Sup. Ct. 992, 32 L. Ed. 253.)

If the drastic measure adopted by the state of Massachusetts to prevent an epidemic of disease may be upheld, it is not apparent why the power of the legislature should fail in the presence of the lingering pestilence which the statute of this state seeks to stamp out.  · If the importation, manufacture and sale of a perfectly inoffensive article of food may be prohibited merely because commercial fraud would prosper upon it, intoxicating liquor ought not to be able to defy the law.

In the *License Cases*, 5 How. 504, 12 L. Ed. 256, the purpose of some of the statutes there assailed was charged to be to prohibit altogether the importation and sale of intoxicating liquors; therefore, it was

proper for the court to discuss prohibition as an extension of the power of the state against the traffic in intoxicating liquors.   Chief Justice Taney said :

"But although a state is bound to receive and to permit the sale by the importer of any article of merchandise which congress authorizes to be imported, it is not bound to furnish a market for it, nor to abstain from the passage of any law which it may deem necessary or advisable to guard the health or morals of its citizens, although such law may discourage importation, or diminish the profits of the importer, or lessen the revenue of the general government.   And if any state deems the retail and internal traffic in ardent spirits injurious to its citizens, and calculated to produce idleness, vice, or debauchery, I see nothing in the constitution of the United States to prevent it from regulating and restraining the traffic or from prohibiting it altogether, if it thinks proper.   Of the wisdom of this policy, it is not my province or my purpose to speak.   Upon that subject, each state must decide for itself.   .   .   .   Upon the whole, therefore, the law of New Hampshire is, in my judgment, a valid one.   For, although the gin sold was an import from another state, and congress has clearly the power to regulate such importations, under the grant of power to regulate commerce among the several states, yet, as congress has made no regulation on the subject, the traffic in the article may be lawfully regulated by the state as soon as it is landed in its territory, and a tax imposed upon it, or a license required, or the sale altogether prohibited, according to the policy which the state may suppose to be its interest or duty to pursue."   (Pages 577 and 586.)

Justice McLean said :

"The state cannot, with a view to encourage its local manufactures, prohibit the use of foreign articles, or impose such a regulation as shall in effect be a prohibition.   But it may tax such property as it taxes other and similar articles in the state, either

specifically or in the form of a license to sell.    A license may be required to sell foreign articles, when those of a domestic manufacture are sold without one. And if the foreign article be injurious to the health or morals of the community, a state may, in the exercise of that great and conservative police power which lies at the foundation of its prosperity, prohibit the sale of it." (Page 592.)

Justice Catron said :

"I admit as inevitable, that, if the state has the power of restraint by licenses to any extent, she has the discretionary power to judge of its limit, and may go to the length of prohibiting sales altogether, if such be her policy." (Page 611.)

Justice Woodbury said :

"From the first settlement of this country, and in most other nations, ancient or modern, civilized or savage, it has been found useful to discountenance excesses in the use of intoxicating liquor.    And without entering here into the question whether legislation may not, on this as other matters, become at times intemperate, and react injuriously to the salutary objects sought to be promoted, it is enough to say, under the general aspect of it, that the legislation here is neither novel nor extraordinary, nor apparently designed to promote other objects than physical, social and moral improvement.    On the contrary, its tendency clearly is to reduce family expenditures, secure health, lessen pauperism and crime, and cooperate with, rather than counteract, the apparent policy of the general government itself in respect to the disuse of ardent spirit.

"They aim, then, at a right object.    They are calculated to promote it.    They are adapted to no other. And no other, or sinister, or improper view can, therefore, either with delicacy or truth, be imputed to them.

"But I go further on this point than some of the court, and wish to meet the case in front, and in its worst bearings.    If, as in the view of some, these license laws were really in the nature of partial or en-

The State v. Durein.

tire prohibitions to sell certain articles within the limits of a state, as being dangerous to public health and morals, or were virtual taxes on them as state property in a fair ratio with other taxation, it does not seem to me that their conflict with the constitution would, by any means, be clear. . . .

"The power to forbid the sale of things is surely as extensive, and rests on as broad principles of public security and sound morals, as that to exclude persons. And yet who does not know that slaves have been prohibited admittance by many of our states, whether coming from their neighbors or abroad? And which of them cannot forbid their soil from being polluted by incendiaries and felons from any quarter?

"Nor is there in my view any power conferred on the general government which has a right to control this matter of internal commerce or police, while it is fairly exercised so as to accomplish a legitimate object, and by means adapted legally and suitably to such end alone. New Hampshire has, for many years, made it penal to bring into her limits paupers even from other states; and this is believed to be a power exercised widely in Europe among independent nations, as well as in this country among the states. (N. H. Rev. Stat. 1843, 'Paupers,' 140.)

"It is the undoubted and reserved power of every state here, as a political body, to decide, independent of any provisions made by congress, though subject not to conflict with any of them when rightful, who shall compose its population, who become its residents, who its citizens, who enjoy the privileges of its laws, and be entitled to their protection and favor, and what kind of property and business it will tolerate and protect." (Pages 627 and 629.)

Justice Greer said:

"It is not necessary for the sake of justifying the state legislation now under consideration to array the appalling statistics of misery, pauperism, and crime which have their origin in the use or abuse of ardent spirits. The police power, which is exclusively in the states, is alone competent to the correction of these

great evils, and all measures of restraint or prohibition necessary to effect the purpose are within the scope of that authority." ( Page 632.)

In *Bartemeyer v. Iowa*, 18 Wall. 129, 21 L. Ed. 929, decided after the adoption of the fourteenth amendment to the constitution of the United States, the court (italicizing the word " prohibiting" as indicated) said :

"The weight of authority is overwhelming that no such immunity has heretofore existed as would prevent state legislatures from regulating and even *prohibiting* the traffic in intoxicating drinks, with a solitary exception. · That exception is the case of a law operating so rigidly on property in existence at the time of its passage, absolutely prohibiting its sale, as to amount to depriving the owner of his property.    A single case, that of *Wynehamer v. The People*, 3 Kernan, 486, has held that as to such property the statute would be void for that reason.    But no case has held that such a law was void as violating the privileges or immunities of citizens of a state or of the United States.    If, however, such a proposition is seriously urged, we think that the right to sell intoxicating liquors,.so far as such a right exists, is not one of the rights growing out of citizenship of the United States, and in this regard the case falls within the principles laid down by this court in the *Slaughter-house Cases*."    ( Page 133.)

This declaration was made in opposition to the opinion of Justice Field, who dissented on the specific ground that it allowed prohibition of the sale of intoxicating liquors in any way for any use.

In the concurring opinion of Mr. Justice Bradley, no distinction is recognized between intoxicating liquors and other kinds of property, if harm result from their use.   He said :

"No one has ever doubted that a legislature may prohibit the vending of articles deemed injurious to the safety of society, provided it does not interfere

with vested rights of property. When such rights stand in the way of the public good they can be removed by awarding compensation to the owner. When they are not in question, the claim of a right to sell a prohibited article can never be deemed one of the privileges and immunities of the citizen." (Page 136.)

In *Beer Co. v. Massachusetts*, 97 U. S. 25, 24 L. Ed. 989, it was held :

"All rights are held subject to the police power of a state ; and, if the public safety or public morals require the discontinuance of any manufacture or traffic, the legislature may provide for its discontinuance, notwithstanding individuals or corporations may thereby suffer inconvenience.

"As the police power of a state extends to the protection of the lives, health, and property of her citizens, the maintenance of good order, and the preservation of the public morals, the legislature cannot, by any contract, devest itself of the power to provide for these objects.

"While the court does not assert that property actually in existence, and in which the right of the owner has become vested when a law was passed, may, under its provisions, be taken for the public good without due compensation, nor lay down any rule at variance with its decisions in regard to the paramount authority of the constitution and laws of the United States, relating to the regulations of commerce with foreign nations and among the several states, or otherwise, it reaffirms its decision in *Bartemeyer v. Iowa*, 18 Wall. 129, 21 L. Ed. 929, that, as a measure of police regulation, a state law prohibiting the manufacture and sale of intoxicating liquors is not repugnant to any clause of that constitution."

In *Mugler v. Kansas*, 123 U. S. 623, 660, 8 Sup. Ct. 273, 31 L. Ed. 205, the private right to manufacture liquor for the producer's own individual use was contended for, a right of equal rank with that of manufac-

turing or selling for medical, scientific or mechanical purposes. But the court said :

"It will be observed that the proposition, and the argument made in support of it, equally conceded that the right to manufacture drink for one's own personal use is subject to the condition that such manufacture does not endanger or affect the rights of others. If such manufacture does prejudicially affect the rights and interests of the community, it follows, from the very premises stated, that society has the power to protect itself, by legislation, against the injurious consequences of that business. As was said in *Munn v. Illinois*, 94 U. S. 113, 124, 24 L. Ed. 77, while power does not exist with the whole people to control rights that are purely and exclusively private, government may require 'each citizen to so conduct himself, and so use his own property, as not unnecessarily to injure another.'

"But by whom, or by what authority, is it to be determined whether the manufacture of particular articles of drink, either for general use or for the personal use of the maker, will injuriously affect the public ? Power to determine such questions, so as to bind all, must exist somewhere ; else society will be at the mercy of the few, who, regarding only their own appetites or passions, may be willing to imperil the peace and security of the many, provided only they are permitted to do as they please. Under our system that power is lodged with the legislative branch of the government. It belongs to that department to exert what are known as the police powers of the state, and to determine, primarily, what measures are appropriate or needful for the protection of the public morals, the public health, or the public safety."

Other decisions by the supreme court of the United States equally far-reaching in principle might be quoted.

As early as 1875 this court said :

"The legislature may suppress the liquor traffic alto-

gether, or it may impose such restrictions as it deems wise." (*Haug v. Gillett*, 14 Kan. 140, 142.)

The highest courts of other states have recognized the same power in passing upon laws which deprived the individual citizen of all right whatever to engage in the liquor traffic. (*State v. Aiken*, 42 S. C. 222, 26 L. R. A. 3.45; *Sheppard v. Dowling, Judge, &c.*, 127 Ala. 1; *Farmville v. Walker*, 101 Va. 323; *Guy v. Commissioners*, 122 N. C. 471. See, also, 17 A. & E. Encycl. of L., 2d ed., 206.)

It is said, however, that in no case has it been decided that the sale of intoxicating liquors for medical, scientific and mechanical purposes may be entirely prohibited, when that was the question under discussion. But the principles announced are determinative of that question.

Power to legislate for the health, morals, peace and good order of society being conceded to the legislature, that body must determine the limits of its exercise, subject only to the condition that the measures adopted be reasonably appropriate to effect its purposes, and upon this question the court will rarely substitute its judgment for that of the legislature. In the recent case of *Otis v. Parker*, 187 U. S. 606, 23 Sup. Ct. 168, 47 L. Ed. 323, the supreme court of the United States sustained an amendment to the constitution of the state of California making void "all contracts for the sales of shares of the capital stock of any corporation or association, on margin, *or to be delivered at a future day*," and in doing so said :

"The objection urged against the provision in its literal sense is that this prohibition of all sales on margin bears no reasonable relation to the evil sought to be cured, and therefore falls within the first section of the fourteenth amendment. It is said that it unduly limits the liberty of adult persons in making con-

tracts which concern only themselves, and cuts down
the value of a class of property that often must be dis-
posed of under contracts of the prohibited kind if it is
to be disposed of to advantage, thus depriving persons
of liberty and property without due process of law,
and that it unjustifiably discriminates against prop-
erty of that class, while other familiar objects of
speculation, such as cotton or grain, are not touched,
thus depriving persons of the equal protection of the
laws.

"It is true, no doubt, that neither a state legislature
nor a state constitution can interfere arbitrarily with
private business or transactions, and that the mere
fact that an enactment purports to be for the protec-
tion of public safety, health or morals, is not con-
clusive upon the courts. *Mugler v. Kansas*, 123 U.
S. 623, 661, 8 Sup. Ct. 273, 31 L. Ed. 205 ; *Lawton v.
Steele*, 152 id. 133, 137, 14 Sup. Ct. 499, 38 L. Ed. 385.
But general propositions do not carry us far.   While
the courts must exercise a judgment of their own, it
by no means is true that every law is void which
may seem to the judges who pass upon it excessive,
unsuited to its ostensible end, or based upon concep-
tions of morality with which they disagree.   Consid-
erable latitude must be allowed for differences of view
as well as for possible peculiar conditions which this
court can know but imperfectly, if at all.   Otherwise
a constitution, instead of embodying only relatively
fundamental rules of right, as generally understood
by all English-speaking communities, would become
the partizan of a particular set of ethical or economic
opinions, which by no means are held *semper ubique et
ab omnibus*.

"Even if the provision before us should seem not
to have been justified by the circumstances locally
existing in California at the time when it was passed,
it is shown by its adoption to have expressed a deep-
seated conviction on the part of the people concerned
as to what that policy required.   Such a deep-seated
conviction is entitled to great respect.   If the state
thinks that an admitted evil cannot be prevented ex-

cept by prohibiting a calling or transaction not in itself necessarily objectionable, the courts cannot interfere, unless, in looking at the substance of the matter, they can see that it 'is a clear, unmistakable infringement of rights secured by the fundamental law.' _Booth v. Illinois_, 184 U. S. 425, 429, 22 Sup. Ct. 425, 46 L. Ed. 623.''

Those organized portions of society called states have their own peculiarities—physical, mental, moral, and industrial. They have a right to the development and display of their own individualities in their own way, and acts of the legislature adapted to the wants and conditions of the people of one state might be wholly unsuited to the welfare of the people of another state differently situated and with different civic needs and purposes. No body of men can be so well informed regarding the composition, character and distribution of the state's citizenship; the origin, habits, customs, culture and ideals of the people; the modifying influences of their environment; the scope and possibilities of their industries, and all other facts relating to their welfare as a distinct political entity, as representatives of those people chosen from the various localities of the territory concerned. They understand better than any court possibly can the evils chargeable to the presence of intoxicating liquors among their own constituents; they know the extent to which intoxicating liquors are used and may be used by their own people, as medicine and in lawful business pursuits; they are able to judge what are and what are not desirable means to desirable ends; and if in their judgment high license, low license, local option, state monopoly and all other methods of regulation and restraint are fruitless measures for the protection of the health, morals, peace and safety of the state against the use of intoxicating liquors; if

under the best possible regulations drug-stores or other dispensaries become in fact saloons ; if such records of sales as are made at those places reek with rottenness ; if by such expedients the door is merely opened to deception and fraud and perjury ; if unpreventable infractions of the best liquor law devisable lead to. a general disregard of law and contempt for its enforcement and administration ; and if drunkenness still remains common, the legislature may banish the traffic altogether.  Whether as a matter of policy the legislature ought to go to any such length the courts have no right to say.  That it has the power, under the law, to do so, the courts cannot, under the law, do otherwise than declare.

As shown by the decisions quoted and referred to, the right to sell intoxicating liquors is not one of the privileges or immunities of a citizen of the United States, and the power of the state legislature over the subject is not affected by the fourteenth amendment to the constitution of the United States.

The amendment to the constitution of this state already quoted does not limit or abridge the power of the legislature further to prohibit the traffic in intoxicating liquors.  It restrains the legislature in its power to tolerate only, and not in its power to suppress.  The sole purpose of the exception relating to medical, scientific and mechanical purposes is to mark the limit of the positive inhibition which is established.  There is no convenient word which connotes all the purposes other than medical, scientific and mechanical for which intoxicating liquors may be used.  If such other purposes may be indicated by the word " beverage," the effect of the amendment is the same as if it simply read : " The manufacture and sale of intoxicating liquors for beverage purposes shall be forever prohibited in this state."  Therefore, the status of the manufacture

and sale of such liquors for medical, scientific and mechanical purposes was in no manner fortified by the constitutional amendment, but it was left to be dealt with by the legislature as necessity might require, having particular regard to the complete suppression of manufacture and sale for beverage purposes.

In appellant's brief some reference is made to the rights reserved by the constitution to the people, and the language of the decision in the case of *The State, ex rel., v. City of Topeka*, 31 Kan. 452, 454, is quoted, as follows :

"The sovereign power of the state of Kansas, as in all governments by the people, is inherent in the people. They are the original source and fountain from which emanates all power, civil and political ; and the various branches or departments of the government are simply the instruments of sovereignty, and not the sovereignty itself. Even the legislature is a mere instrument of sovereignty, a servant of the sovereign, and not the sovereign itself."

But the people have set the constitution over themselves as a limitation upon their own sovereignty, and it is their duty to obey it precisely the same as officials who are given authority under it. By that instrument a government has been established, and its powers defined and distributed. Among the powers granted are such as are designated legislative, executive, and judicial. These are sovereign powers, and the people, having delegated them to instruments of their own creation, cannot interfere with their exercise. They may meet in their organized political capacity and change the fundamental law, but so long as the constitution stands they cannot legislate, or execute laws, or adjudicate controversies. The recognition of any other doctrine would sound the death-knell of constitutional government.

It is elementary law that grants of power by state constitutions to state legislatures include all legislative power that is not expressly withheld. The only limitations upon the power of the legislature over the subject-matter of this litigation are those already indicated. No right to determine the extent to which intoxicating liquors may be sold in the state was reserved to the appellant, and he must abide by the regulations adopted by the lawmaking body.

Such being the law, no individual has any enforceable right to a permit to sell intoxicating liquors. What the legislature may entirely withhold, it may grant upon such terms as it may see fit. Any conditions which in its wisdom it may deem necessary to impose must be met and endured. An official could be designated for the purpose, and given authority to appoint persons to manufacture and sell intoxicating liquors, as the governor appoints notaries public, and no individual who might thus be excluded from the business could complain. The case of *Yick Wo v. Hopkins*, 118 U. S. 356, 6 Sup. Ct. 1064, 30 L. Ed. 220, relied upon by the appellant, has been distinguished by the court which decided it from cases involving regulations of the traffic in intoxicating liquors.

"It will thus be seen that that case was essentially different from the one now under consideration, the ordinance there held invalid vesting uncontrolled discretion in the board of supervisors with reference to a business harmless in itself and useful to the community; and the discretion appearing to have been exercised for the express purpose of depriving the petitioner of a privilege that was extended to others. In the present case the business is not one that any person is permitted to carry on without a license, but one that may be entirely prohibited or subjected to such restriction as the governing authority of the city

may prescribe." (*Crowley v. Christensen*, 137 U. S. 86, 94, 11 Sup. Ct. 13, 34 L. Ed. 620.)

This court, however, does not admit that the power vested in the probate judge to grant or refuse permits is an arbitrary one. In order to obtain a permit an application must be presented tendering specific issues; notice of a hearing must be given; the county attorney is required to appear at the hearing and cross-examine witnesses, and other interested persons may do so; evidence must be introduced in support of the application, and contrary evidence must be heard if offered; the probate judge then decides upon the merits of the entire case, and a review of his final conclusion is contemplated. Therefore, the legislature did not intend that the probate judge should be guided in any particular by his own will instead of the facts developed at the hearing. Among the qualifications to be established are good moral character, trustworthiness to meet the responsibilities of the business, good faith in personally conducting business as a pharmacist, and the extent of the applicant's qualifications as a pharmacist. These matters are of such a peculiar character that any action taken in respect of them requires the exercise of good judgment and a sound discretion, if the public welfare is to be subserved. In any case there might be substantial and uncontradicted evidence upon every matter requiring proof and yet it might be evident that a permit ought not to be granted.

In *Yick Wo v. Hopkins, supra*, the court said:

"The ordinance, therefore, also differs from the not unusual case, where discretion is lodged by law in public officers or bodies to grant or withold licenses to keep taverns, or places for the sale of spirituous liquors, and the like, when one of the conditions is that the applicant shall be a fit person for the exercise

of the privilege, because in such cases the fact of fitness is submitted to the judgment of the officer, and calls for the exercise of a discretion of a judicial nature.'' (Page 368.)

While, therefore, in the preparation of the statute, the words vesting discretion in the probate judge were placed after words requiring that the averments of the application must be proved to his satisfaction, they nevertheless do not open to him an additional field of option, in which prejudice or caprice may rule.   The discretion is still a legal one, to be exercised only upon the facts and circumstances of the case after a full hearing.

'' Section 6 provides that upon such vendor's filing his sworn application, depositing $500 and paying $25 the state treasurer *shall* issue a license to him, and section 9 provides that the city or town clerk, when authorized by said board and upon payment of the license fee, *shall* issue a license, but it provides, that though such vendor has complied with every requirement of the law down to the time the aldermen or selectmen 'act upon such application,' they may then refuse the license if in their judgment it should not be granted.   The act does not confer upon this board authority to grant or refuse licenses at their mere option, as in *Yick Wo v. Hopkins,* and in *State v. Conlon, supra.*   Here the board are required to act forthwith upon the application and to exercise their judgment whether a license should or should not be granted. If they should refuse to act in any case they could doubtless be moved by mandamus.   When they have acted and passed their judgment upon the application, resort to mandamus cannot be had because they are invested with *quasi*-judicial power, and the legal presumption is that they have acted judiciously.   No point is made in the respondent's brief that it is not competent to leave the granting of licenses to the judgment of the board of aldermen or selectmen. Discretion should be reposed in some person, otherwise books, pictures and other merchandise of an im-

moral character might be offered for sale. Whether there is reason to apprehend that vendors who go about from place to place, disposing of goods by auction and private sale, will deceive and defraud the public as to the quality of the goods sold, the legislature, as was said by the court in *State v. Conlon*, must be the judge." (*State v. Harrington*, 68 Vt. 622, 34 L. R. A. 100, 104.)

Under the statutes of 1881 and 1885 the action of the probate judge in granting permits was not judicial. No method of procedure was established beyond the requirement that a petition of a certain character be filed. No hearing was provided for, and the probate judge was left to satisfy himself of the truth of the petition in any manner he saw fit. No appeal was provided for in the statutes themselves, and no other statute was available for that purpose. His functions were merely those of a commissioner of licenses. (*Martin & Milliken v. Probate Judge*, 32 Kan. 146; *Stanley v. Monnett, Probate Judge*, 34 id. 708.) Both these cases were decided prior to 1887.

The statute of 1887, however, changed the whole character of the proceeding. It then took the form of a trial between the applicant and the state, represented by the county attorney, held after notice, based upon a written petition whose allegations are in effect denied by the law and are to be supported and opposed by evidence, ending in a recorded judgment sustaining or refusing the right to exercise the authority prayed for, and followed by an appeal or proceeding in error if any interested party should feel aggrieved. Therefore, the power of the probate judge over the matter is now essentially of a judicial character; the proceeding is virtually a judicial proceeding, and he acts not as a commissioner but as a court. In order that

The State v. Durein.

a probate judge may exercise such power it is not necessary that he be designated a court.

"It has already been decided in this court, and we think rightly, that it is not necessary that the legislature, in order to create a court, or to confer judicial power, should first in terms create a court. *Malone v. Murphy*, 2 Kan. 250 ; *The State of Kansas v. Young and others*, 3 id. 445. Whenever the legislature confers upon any board or officer powers which are unquestionably judicial in their nature, and when they also invest such board or officer with all the instruments and paraphernalia of a court, they undoubtedly create a court although they may not in terms say so." (*Prell v. McDonald*, 7 Kan. 426, 447.)

The power of the legislature to create such a tribunal is undoubted. (*Matthews v. Comm'rs of Shawnee Co.*, 34 Kan. 606 ; *Morris v. Bunyan*, 58 id. 210.)

The duties to be discharged are cast upon the person at the time holding the office of probate judge, and not upon him as probate judge, or upon the probate court. Such duties not being incompatible with any functions possessed by that individual in his capacity as judge of the probate court, he can lawfully undertake them (*Young v. Ledrick*, 14 Kan. 92 ; *The State, ex rel., v. Majors*, 16 id. 440 ; *Intoxicating-liquor Cases*, 25 id. 751) ; and the right of appeal from his action can be conferred upon the district court.

"Any matter judicial in its character can be taken from even a road-overseer to the district court, provided the statutes authorize the same." (*Wilson v. Price-raid Aud. Com.*, 31 Kan. 257, 259.)

In the statute under consideration both an appeal and a review on error are given. Since the discretion of the probate judge is not of the arbitrary and unrestrained character described by appellant, the proceeding in error is sufficient to safeguard his rights. But the provision for an appeal is also valid. Upon filing

the bond the district court becomes vested with jurisdiction ( 2 Cyc. 965), and it may then regulate all subsequent proceedings.

"Where no mode of appeal is provided by the legislature, in such cases the appellate court may frame rules of procedure to bring the case before it." (2 Encyc. Pl. & Pr. 14.)

The case of *Ward v. Ward*, 37 Tex. 389, cited in the case of *In re Hendricks*, 60 Kan. 796, 807, 57 Pac. 965, has no application. In that case the legislature authorized appeals from interlocutory judgments and directed that the procedure be governed by the law regulating appeals from final judgments, which was wholly inapplicable. Having specified an unworkable scheme, none other was open to adoption, and the law failed.

The provisions of the statute authorizing a summary revocation of a permit are also valid. ( *Wallace v. The Mayor etc. of the City of Reno*, 73 Pac. [Nev.] 528.)

From all this it follows that the statutes complained of are in all respects constitutional and valid, the original position taken by this court is adhered to, and the order affirming the judgment of the district court will not be disturbed.

All the Justices concurring.